# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

DEC 2 6 2001

| | | |
|---|---|---|
| RKI, INC., d/b/a ROLL-KRAFT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 01 C 8542 |
| v. | ) | |
| | ) | |
| STEVEN GRIMES and CHICAGO | ) | |
| ROLL CO., INC., | ) | Magistrate Judge Morton Denlow |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a case about how an employee who signed a non-disclosure and non-compete agreement chose to join a competitor. This is a textbook case of how not to do it.

The Court conducted a bench trial on December 17, 18 and 19 and heard closing arguments on December 20, 2001, in connection with the complaint brought by Plaintiff, RKI, Inc., d/b/a Roll-Kraft ("Roll-Kraft") that Defendant Steven Grimes ("Grimes") misappropriated Roll-Kraft's confidential data and software and breached his covenant not to disclose and not to compete when he was subsequently employed by Defendant Chicago Roll Corporation ("Chicago Roll"). The Court has carefully considered the testimony of the witnesses who appeared at trial, the witnesses who appeared through depositions, the exhibits introduced into evidence, the written submissions of the parties and the fine arguments of counsel.

27

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

## I. **FINDINGS OF FACT**

### A. **NATURE OF ACTION**

1.      Roll-Kraft claims that Defendants are engaged in unfair competition. Roll-Kraft alleges that Grimes misappropriated Roll-Kraft's confidential data and used and disclosed the confidential data to benefit his new employer Chicago Roll. Roll-Kraft also alleges that Grimes breached the nondisclosure and non-solicitation covenants in his Employment Agreement and that Chicago Roll knew of Grimes' Employment Agreement when it hired him and interfered with that contract. Roll-Kraft asserts five causes of action: (1) violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.; (2) conversion; (3) breach of the duty of loyalty owed by an employee; (4) breach of the nondisclosure and non-solicitation covenants; and (5) tortious interference with contract. Count 1 seeks relief against Grimes and Chicago Roll; Counts 2, 3 and 4 seek relief against Grimes; and Count 5 is directed against Chicago Roll.

### B. **THE PARTIES**

2.      Roll-Kraft is an Ohio corporation with its principal place of business in Mentor, Ohio. Roll-Kraft was founded in 1963. Roll-Kraft is engaged in the business of

producing and selling tube and pipe mill rolls and roll formed tooling. In addition, Roll-Kraft assists tube and pipe and roll formed companies to increase machine life, reduce costly repairs, reduce setup time and improve overall efficiency through upgrading mills with unique retrofitting and quick change equipment. (PX 35). Charles C. Gehrisch, Jr. ("Gehrisch") is the President and principal shareholder of Roll-Kraft. Martin Byrne ("Byrne") is the Vice President of Sales of Roll-Kraft. Joseph Frandanisa ("Frandanisa") is the Director of Sales of Roll-Kraft. Gehrisch, Byrne and Frandanisa testified in person at the trial. Their testimony was credible. Michael Andre ("Andre") and Mark Principe ("Principe") are in the Information Services Department at Roll-Kraft. Andre and Principe testified by means of deposition at the trial. Jerry Saperstein ("Saperstein") is a computer forensics specialist who was retained by Roll-Kraft as an expert witness in this case to inspect the computers of Grimes and Chicago Roll. Saperstein testified in person at the trial. Saperstein was a careful, precise, credible and knowledgeable expert witness. George A. Tracy, Jr. ("Tracy") was a salesman employed by Chicago Roll from February 2000 through early December 2001 when he was discharged by Chicago Roll; prior to that, he was employed as a salesman by Roll-Kraft. Tracy testified by means of deposition.

3.     Defendant Grimes is a citizen of St. Charles, Illinois. From March 1999 until his October 18, 2001 resignation, Grimes was employed as a salesman by Roll-Kraft. On October 18, 2001, he began work as a salesman for Chicago Roll, a direct competitor of Roll-Kraft. Although Grimes sat through the entire trial, he did not testify. Grimes was listed as a "will call" witness by Defendants in the final pretrial order. The Court draws an adverse

inference by reason of Grimes' decision not to testify to rebut statements attributed to him and to fail to explain key events in this case for which he had personal knowledge such as why he accessed Roll-Kraft's computers on the evening of October 16, 2001, why 60 megabytes of data were deleted from his home computer after this litigation was instituted and why his home computer was defragmented on four occasions in November, 2001.

4.     Defendant Chicago Roll is an Illinois corporation with its principal place of business in Lombard, Illinois. Chicago Roll is engaged in producing and selling tube and pipe mill rolls. Chicago Roll is a direct competitor of Roll-Kraft in the highly competitive tube, pipe and roll formed tooling industry. Harold Focht ("Focht") is the President and sole shareholder of Chicago Roll. Wendy Fuscone ("Fuscone") is the Comptroller of Chicago Roll and runs its computers. Robert Manos ("Manos") is the Vice President of Sales of Chicago Roll. Joseph Olson ("Olson") was the President and fifty percent shareholder of Chicago Roll until 1999 when he sold his interest to Focht; he is presently a competitor of Roll-Kraft and Chicago Roll. Jeff George ("George") and Wally Mullin ("Mullin") are salesmen for Chicago Roll. Although Focht sat through the trial, he did not testify. Focht, Manos, George and Mullin were listed as "will call" witnesses by Defendants in the final pretrial order. Defendants called no witnesses in their defense, and the Court draws an adverse inference by reason of Chicago Roll's decision not to call a witness to explain why information was deleted from its computers after this litigation commenced.

4

## C. ROLL-KRAFT – GRIMES EMPLOYMENT AGREEMENT AND TRAINING

5.     In 1996, Roll-Kraft opened a facility in Frankfort, Illinois to better service its accounts in Illinois, Indiana, Iowa, Missouri and Wisconsin.

6.     On March 12, 1999, Roll-Kraft offered Grimes a position as a salesman to work out of the Frankfort, Illinois office where he would service accounts in Illinois, Indiana, Iowa, Missouri and Wisconsin. (PX 2).  Grimes accepted the offer and began a training period.  In the event the initial 60 - 90 day training period was successful, the offer contemplated a written employment agreement. (PX 2).  Grimes had prior experience as a salesman but no prior experience in Roll-Kraft's industry.  During this training, Grimes was introduced to many of Roll-Kraft's longstanding customers and was provided comprehensive information concerning the customer contacts, their buying histories, their future needs and other confidential proprietary information which Roll-Kraft had developed over the years.  Grimes successfully completed his initial training.

7.     On May 12, 1999, Grimes and Roll-Kraft entered into a two-year Employment Agreement with a one year automatic extension unless terminated. (PX 1).  That Agreement includes nondisclosure and non-solicitation provisions.   Specifically, the Agreement provides:

> 6.     NON-DISCLOSURE/NON-COMPETITION.
>
> Employee agrees as follows:
>
> (a)     That during the term of this Agreement and at any time after Employee leaves the Company, Employee shall not, without prior written consent of the Company in each instance

obtained, directly or indirectly, communicate, disclose, transmit, disseminate or otherwise publish or reveal in any form whatsoever to third parties, the Proprietary Information (as hereinafter defined) imparted to Employee by the Company (except as required in the discharge of Employee's duties to the Company). "Proprietary Information" shall mean any and all information, including, but not limited to, information concerning the design and development of tooling used in the Company's business, not generally known or recognized as standard practices, and information which is disclosed to, developed by, or known by Employee concerning any and all of the technology, research, test procedures and results, inventions, concepts, documentation, and computer programming, formulae, manufacturing processes and products, produced or developed by the Company, its successors or assigns.

***

(c)     That during the term of this Agreement and for a period of three (3) years after the termination of this Agreement for any reason, Employee shall not within Lake, Ashtabula, Geauga and Cuyahoga Counties or within a radius of fifty (50) miles from Chicago, Illinois, and Birmingham, Alabama solicit or induce or attempt to solicit or induce, employees or sales representatives of the Company to terminate their employment by or representation of the Company; or solicit customers of the Company or solicit or accept business, patronage or orders directly or indirectly from existing or potential customers of the Company, whether on his own account, or as a partner, joint venturer, employee, agent, representative, consultant, or as a shareholder of any corporation. This covenant is of the essence of this Agreement and shall be construed as independent of any other provision of this Agreement; and the existence of any claim or cause of action of Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of this covenant by the Company.

***

(e)     That in the event of a breach or threatened breach by Employee of the provisions of Subparagraphs a, c and d hereof, the Company and its successors, assigns and affiliates (as third party beneficiaries) shall be entitled to an injunction restraining such violation, it being understood that the Company and its successors, assigns and affiliates may also pursue other available remedies for such breach or threatened breach, including the recovery of damages.

8.     Grimes had no prior experience or customers in the industry when he was hired by Roll-Kraft. Roll-Kraft devoted extensive efforts to training Grimes about its industry and products. Roll-Kraft introduced him to its customers and gave him lists of existing customers and qualified prospects. But for his employment at Roll-Kraft, Grimes would not have knowledge of Roll-Kraft's customers and proprietary customer information. Roll-Kraft spent a great deal of time and money on Grimes' travel and entertainment, sending other sales employees, engineers and service employees on customer calls with Grimes and supporting his sales efforts.

9.     Roll-Kraft is a job shop. It designs its own products and manufactures them in its own shop. Roll-Kraft commands a premium price for its products because of their quality and service. It has been doing business with its customers for many years and holds a large market share at its major customers and in the submarket for premium products and services. Roll-Kraft is the largest company in its industry.

10.     The non-disclosure and non-competition provisions of the Employment Agreement were reasonable because Roll-Kraft had developed substantial proprietary information regarding its customers and prospects which a) were not known outside Roll-

7

Kraft's business; b) Roll-Kraft took reasonable measures to safeguard; c) was developed at substantial expense to Roll-Kraft; d) would have great value if disclosed to competitors; and e) would be extremely difficult to duplicate without the expenditure of years of time and millions of dollars of resources.

## D.  ROLL-KRAFT'S CONFIDENTIAL INFORMATION AND GRIMES' ACCESS TO IT

11.  By reason of Grimes' position as a salesperson for Roll-Kraft, Grimes had access to and used Roll-Kraft's customer contact management system (the "ACT" system) which contained confidential, sensitive, proprietary information including but not limited to the following for each customer and potential customer of Roll-Kraft:

    a.  Name, address and telephone number;

    b.  Details of any pending quotations;

    c.  Details of visits or other contacts with the customer, including the subject of the contact;

    d.  Year-to-date sales and prior year sales; and

    e.  Information about persons with influence over purchasing decisions.

12.  In 2001, Roll-Kraft spent approximately six months developing its own proprietary basic account contact management software (the "BAM" system) at substantial expense in order to give Roll-Kraft a further competitive advantage. In July 2001 Roll-Kraft implemented its new BAM software.  BAM represents an improvement over the previous ACT system. (PX 16a - 16j).  Under the BAM system, information regarding a customer is available by: 1) salesperson; 2) product use; 3) result of last contact; 4) last contact

8

information; 5) contact type; b) competition; 7) territory; and 8) country. (PX 16a). Roll-Kraft collects and retains detailed information on every customer and prospect which identifies the customer's decision maker, the products used, the results of each visit made to the customer, open quotes for orders, pricing information and other customer specific information. This system was devised in order to give Roll-Kraft a competitive advantage in servicing its existing customers, in developing new business and enabling a new salesperson to step in without missing a beat. This information was accumulated over many years and at a cost of millions of dollars.

13.     In addition to ACT and BAM, Grimes also had access to certain reports on another computer system at Roll-Kraft known as NPI. The NPI system contains confidential and sensitive information including but not limited to:

        a.     Proposals (quotations);

        b.     Orders;

        c.     Prices;

        d.     Cost information;

        e.     Profit margins;

        f.     Shipping dates;

        g.     Inquiry dates;

        h.     Prices and other terms of arrangements with vendors of goods and services;

        i.     Financial statements; and

    j.  Strategic plans.

Grimes had access to all of these reports, except financial statements and strategic plans.

   14.  The ACT, BAM and NPI data are proprietary and confidential. Substantial portions of the customer information contained in ACT and BAM is not known to competitors. The proprietary data in ACT, BAM and NPI has been disclosed by Roll-Kraft to its employees only on a "need-to-know" basis and is not generally known or available to the public or competitors. Roll-Kraft maintains the secrecy of such information through such means as limited access and password-protected computer databases. Even within a database, employees have access only to certain reports that are relevant to their jobs and are blocked from access to other reports that they do not have a need-to-know in order to do their jobs. No other employees of Roll-Kraft, except for its Information Services ("IS") Department personnel, can gain access to such ACT, BAM or NPI information. The IS personnel are under strict instructions not to grant access to such information except to the authorized employees with a need-to-know. Roll-Kraft's customer information provides it with a competitive advantage. Roll-Kraft's competitors could derive significant economic value if they obtained access to this information.

   15.  Grimes' Employment Agreement contains a provision that he shall not disclose Roll-Kraft's proprietary information. (PX 1, ¶6(a)). In addition, Roll-Kraft's Employee Handbook contains the following nondisclosure of confidential information provision:

# CONFIDENTIAL NATURE OF WORK

All Roll-Kraft records and information relating to Roll-Kraft or its customers are confidential and employees must treat all matters accordingly. No Roll-Kraft or Roll-Kraft-related information, including without limitation, documents, notes, files, records, oral information, computer files or similar materials (except in the ordinary course of performing duties on behalf of Roll-Kraft) may be removed from Roll-Kraft's premises without permission from Roll-Kraft. Additionally, the contents of Roll-Kraft's records or information otherwise obtained in regard to business may not be disclosed to anyone, except where required for a business purpose. Employees must not disclose any confidential information, purposefully or inadvertently (through casual conversation), to any unauthorized person inside or outside the Company. Employees who are unsure about the confidential nature of specific information must ask their supervisor for clarification. Employees will be subject to appropriate disciplinary action, up to and including dismissal, for knowingly or unknowingly revealing information of a confidential nature.

## EMPLOYER INFORMATION AND PROPERTY

The protection of Roll-Kraft business information, property and all other Company assets are vital to the interests and success of Roll-Kraft. No Roll-Kraft related information or property, including without limitation, documents, files, records, computer files, equipment, office supplies or similar materials (except in the ordinary course of performing duties on behalf of Roll-Kraft) may, therefore, be removed from the Company's premises. In addition, when an employee leaves Roll-Kraft, the employee must return to the Company all Roll-Kraft related information and property that the employee has in his/her possession, including without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, supplies, and equipment or office supplies. Violation of this policy is a serious offense and will result in appropriate disciplinary action, up to and including discharge. (PX 25).

On January 22, 2001, Grimes signed an Acknowledgment agreeing to abide by the Employee Handbook. (PX 26).

16.    Information as to Roll-Kraft's proposals to customers or potential customers, if known to a competitor, would harm Roll-Kraft's ability to win the business. Details of customer contacts and sales figures would provide valuable information to competitors as to sales and marketing opportunities. Information as to Roll-Kraft's prices, costs, profit margins and other financial data would allow a competitor to anticipate Roll-Kraft's future bids. Likewise, information as to the prices and other terms of Roll-Kraft's relationships with vendors of goods and services could allow competitors to pressure the vendors to provide similar terms. A competitor in possession of Roll-Kraft's proprietary and confidential information could unfairly compete with Roll-Kraft through the use of such information.

## E.    GRIMES' DECISION TO GO TO WORK FOR CHICAGO ROLL

17.    Roll-Kraft required that its salesmen add all customer contact information to ACT and BAM promptly and in detail. This task required an average of four to six hours per week for each salesman. Roll-Kraft's President, Gehrisch, carefully monitors the BAM reports as a means of assuring that his sales personnel are performing their work. Beginning in November, 1999, Grimes was told that he was not adequately completing his reports and that his salary would be reduced if his performance did not improve. (PX 3a). Gehrisch determined that Grimes was not performing up to expectations.

18.     On October 3, 2000, Gehrisch reduced Grimes' salary by $2,500 because he failed to comply with Roll-Kraft's requirements for adding customer contact information to ACT. (PX 3a – 3c and 4).

19.     At some time in 2001, Grimes commenced serious discussions with Chicago Roll about coming to work for it. In September, 2001, Grimes called Tracy, Chicago Roll's Regional Sales Manager, to discuss preparation for his departure. Tracy had previously left Roll-Kraft and was sued by it for breach of an employment agreement. Grimes explained to Tracy that he was preparing for an interview with Chicago Roll's President, Harry Focht. Tracy was a personal friend of Grimes and they spoke and e-mailed regularly during September through November, 2001. These conversations took place both before and after Grimes left Roll-Kraft to join Chicago Roll. In the conversations before leaving Roll-Kraft, Grimes told Tracy that he has everything he needs including customer contact information. After joining Chicago Roll, Grimes confirmed to Tracy that he had used some of this information to take away an order from Bull Moose Tube, an active Roll-Kraft account. Grimes told Tracy that he was working for Chicago Roll and that he was looking forward to stealing all of Roll-Kraft's customers and that he had a lot of customers that were coming with him. He also asked Tracy to delete their e-mail correspondence because he was concerned Tracy would be deposed in the litigation. Tracy told Grimes that he would do what he could but would tell the truth if subpoenaed.

20. On October 5, 2001, Manos sent Grimes a letter on behalf of Chicago Roll offering Grimes a position as a salesman. (PX 7). Grimes accepted this offer.

21. Grimes gave a copy of his Roll-Kraft Employment Agreement to Chicago Roll in late September or early October 2001.

22. On Tuesday, October 16, 2001, Byrne, Roll-Kraft's Vice President for Sales, received information that Grimes was talking to Chicago Roll about joining that company. That day, Frandanisa, Roll-Kraft's Director of Sales, twice called Grimes to ask whether he was talking to Chicago Roll about going to work there. On each occasion, Grimes denied that he was.

23. Grimes realized that as a result of Roll-Kraft's suspicion that he was going to join Chicago Roll, he only had a few days left at Roll-Kraft before Roll-Kraft would discover the facts and take action.

## F. GRIMES STEALS ROLL-KRAFT'S CONFIDENTIAL DATA AND RESIGNS

24. On the evening of Tuesday, October 16, 2001, at approximately 9:00 p.m., Grimes used his password to access Roll-Kraft's computer system from his home computer. Grimes had the ability to download or print the ACT, BAM and NPI databases and software and copy them onto his home computer, CD-ROM, zip drive or other storage device.

25. Before resigning from Roll-Kraft, Grimes downloaded or otherwise copied confidential data belonging to Roll-Kraft from the ACT, BAM and NPI databases and proprietary software. After this litigation commenced, Grimes took steps to cover up his

14

wrongful acts. Grimes did not explain why he accessed Roll-Kraft's computer system. Grimes later admitted to Tracy that he took Roll-Kraft's confidential information that would be useful to him while employed by Chicago Roll.

26. On Thursday, October 18, 2001, Grimes sent an e-mail message to Byrne stating that he was resigning effective immediately. (PX 5). Grimes took this action notwithstanding the 30-day notice provision in his Employment Agreement. (PX 1, ¶ 4).

27. Immediately after sending his e-mail resignation, Grimes started work as a salesman for Chicago Roll.

## G.    GRIMES' NEW POSITION AT CHICAGO ROLL

28. As a salesman for Chicago Roll, Grimes calls upon the same customers whom he had called on for Roll-Kraft. His new position with Chicago Roll involves duties and responsibilities similar to those at Roll-Kraft.

29. Grimes' compensation package at Chicago Roll includes a salary of $83,200 plus expenses, a company car, and fringe benefits. This compares with a final salary of $47,500 plus a commission of one and one-half percent at Roll-Kraft.

## H.    GRIMES USES ROLL-KRAFT'S SECRET INFORMATION TO SOLICIT ROLL-KRAFT'S CUSTOMERS

30. Grimes used Roll-Kraft's confidential information to hit the ground running at Chicago Roll. He immediately solicited business for Chicago Roll from customers whom he had called on for Roll-Kraft just a few days earlier, using Roll-Kraft's confidential information to gain a competitive advantage. In just a few days, Grimes made several sales

to such customers.

31.    On his first day at work at Chicago Roll, Grimes signed an indemnity agreement, promising to indemnify and defend Chicago Roll in the event it was sued by Roll-Kraft for violating the covenants in his Employment Agreement. (PX 8).

## I.    GRIMES IGNORES CEASE AND DESIST LETTER FROM ROLL-KRAFT'S COUNSEL

32.    On October 19, 2001, Roll-Kraft's Ohio counsel sent a cease and desist letter to Grimes demanding that he comply with his obligations under his Employment Agreement. (PX 6).  At the time the cease and desist letter was sent, Roll Kraft was not aware that Grimes had taken its confidential information and software.  Grimes never responded to the cease and desist letter and he continued to solicit his former Roll-Kraft customers.

## J.    LAWSUIT FILED AND TRO ENTERED

33.    On November 6, 2001, Roll-Kraft filed its verified complaint. On, November 8, 2001, the Court issued a temporary restraining order ("TRO") that enjoined Grimes from performing sales or marketing activities for Chicago Roll pending a ruling on Roll-Kraft's motion for preliminary injunction, enjoined Grimes and Chicago Roll from using or disclosing Roll-Kraft's confidential information, ordered Grimes and Chicago Roll to return the confidential information to Roll-Kraft and required Grimes and Chicago Roll to certify in writing to the Court and to Roll-Kraft that they had done so.

34.    The TRO scheduled an early evidentiary hearing on the motion for preliminary injunction. On November 9, 2001, Roll-Kraft's counsel served by fax a notice of depositions

scheduling the depositions of Grimes, Focht, Manos, and six other Chicago Roll employees for November 13 and 14, 2001. Counsel for Grimes and Chicago Roll faxed a letter refusing to produce the deponents for depositions at that time. (PX 38).

35.     On November 14, 2001, Roll-Kraft filed an emergency motion to compel depositions and for other relief as a result of Grimes' and Chicago Roll's refusal to appear for depositions. The TRO was extended pending a full trial on the merits. Grimes and Chicago Roll were ordered to produce their computers for inspection by Saperstein, Roll-Kraft's computer forensics expert.

## K.     GRIMES AND CHICAGO ROLL DELETE ROLL-KRAFT'S DATA FROM THEIR COMPUTERS

36.     At some point after this action was filed, Grimes deleted Roll-Kraft's confidential information and software from his home computer and defragmented his computer in an effort to prevent Roll-Kraft from learning this fact. Between November 15 and December 8, 2001, Grimes deleted approximately 60 megabytes of data, the equivalent of 29,297 typewritten pages. (PX 42). In addition, Grimes deleted e-mails with Tracy and others which might have hurt his defense.

37.     On November 15, 2001, the same day the Court ordered inspection of the computers, Grimes defragmented his home computer. Defragmentation is called for when computer files and data are more than 10% fragmented. Defragmentation is also a method to cover up deletions of data by eliminating all traces of deleted data.

38.     Grimes told Saperstein that he defragmented upon advice of a website called

PCPitstop.com that troubleshoots computers over the Internet. Grimes did visit the PCPitstop website that day, but PCPitstop never advised Grimes to defragment his computer. (PX 14(a)–(f)). David Methvin ("Methvin"), a partner in PCPitstop LP, testified by deposition that Grimes' computer was hardly fragmented on November 15 and that PCPitstop did not and would not recommend defragmentation under such circumstances. Methvin is a neutral third party witness with no interest in the outcome of this case. His testimony, which is corroborated by contemporaneous records, was unrebutted. Roll-Kraft's computer forensics expert, Jerry Saperstein, likewise explained that Grimes' computer did not require defragmentation and that the only reason to defragment on November 15 was to cover up deletions of data and make it impossible for Saperstein to discover remnants of those deletions.

39. On November 17, 2001, just two days later, Grimes again defragmented his computer. Once again, he visited PCPitstop.com which found that his computer was not in need of defragmentation. (PX 14(a)–(f)). PCPitstop did not recommend defragmentation on November 17. The purpose of defragmentation was to prevent Roll-Kraft and its computer expert, Saperstein, from discovering any remnants of Roll-Kraft's confidential data on Grimes' computer.

40. On November 21, 2001, Grimes was notified to produce his computer on November 23 for inspection by Saperstein. He promptly defragmented again for the third time in seven days. There was no reason to defragment the computer except to prevent

discovery of Grimes' theft of Roll-Kraft's trade secrets. On November 23, Grimes told Saperstein that he had defragmented on November 21 because he visited PCPitstop on that date and was advised to do so by PCPitstop. However, the records of PCPitstop clearly show that Grimes did not visit that website on November 21. The November 21 defragmentation was for the purpose of preventing Saperstein from discovering any remnants of the deletion of Roll-Kraft's confidential data on Grimes' computer.

41.    Grimes defragmented his computer on November 15, 17, 21 and 24, 2001. Defragmentation was not called for by the condition of Grimes' computer on November 15 or November 17 according to the testing and analysis of Grimes' computer by PCPitstop. No explanation was provided as to why defragmentation was required on November 21 or 24.

42.    Chicago Roll also deleted data from its salesmen's computers after October 15, 2001. There had been no deletions before that date, and there was plenty of empty space on the computer disks in question. Chicago Roll had no policy of deleting data on a set schedule and had no practice of deleting data before October 15. In these circumstances, the deletions from Chicago Roll's salesmen's computers are highly suspicious. The purpose of the deletions was to eliminate evidence of Roll-Kraft's confidential data on Chicago Roll's computers. Saperstein found suspicious deletions on sales laptops used by Manos, Mullin and McGinn at Chicago Roll. McGinn's laptop was defragmented on December 6, two days prior to Saperstein's examination.

43. Grimes' wrongful conduct includes the following:

a. Grimes secretly, and not in furtherance of Roll-Kraft's business, copied or otherwise transmitted Roll-Kraft computer software and secrets and confidential information to his home computer;

b. The copying or transmission of the computer software information occurred at the same time that Grimes was negotiating with or planning to join Chicago Roll;

c. Grimes did not volunteer to tell Roll-Kraft that he had accepted a new job, and in fact denied that he had talked to Chicago Roll when confronted by Roll-Kraft. Grimes knew his access to trade secrets would cease immediately once he announced that he was going to work for Chicago Roll. Even after he secretly accepted a sales position with Chicago Roll, Grimes continued to access Roll-Kraft's confidential computer databases and to engage in other activities which resulted in his gaining further confidences and secrets in the categories described above. The acquisition of such information continued until Grimes abruptly resigned without notice; and

d. Grimes has used Roll-Kraft's confidential information to solicit business from customers of Roll-Kraft whom he formerly had called on for Roll-Kraft; and

e. Grimes has provided Roll-Kraft's confidential information to other Chicago Roll salespersons.

## L. ROLL-KRAFT DOCUMENTS ARE DISCOVERED ON GRIMES' COMPUTER

44. Saperstein discovered confidential Roll-Kraft documents on Grimes' home computer. (PX 20-23). The documents discovered on Grimes' computer include confidential customer contact notes and sales information of Roll-Kraft's various divisions for 2000 and 2001, showing where markets are expanding or contracting. *Id.*

## P. INTERFERENCE WITH CONTRACT CLAIM

45. Chicago Roll knew of Grimes' Employment Agreement with Roll-Kraft and received a copy of it before hiring him. Despite this knowledge, Chicago Roll hired Grimes in a sales position in which he would violate the terms of the Employment Agreement.

46.     Chicago Roll required Grimes to sign an agreement to indemnify and defend it against claims by Roll-Kraft. (PX 8). Chicago Roll was aware of the risk it was taking in hiring Grimes.

47.     The trade secrets that Grimes has used will allow Chicago Roll to gain a substantial unfair competitive advantage over Roll-Kraft. Unless permanently enjoined, Grimes will use – or continue to use – Roll-Kraft's trade secrets on behalf of Chicago Roll.

## R.     AFFIRMATIVE DEFENSES

48.     In addition to denying the material allegations of the verified complaint, Defendants have raised four affirmative defenses. The first affirmative defense alleges that the Employment Agreement between Grimes and Roll-Kraft was terminated in October 2000 when Roll-Kraft, without knowledge or consent of Grimes, unilaterally reduced his salary by $2,500 or five percent. The Court finds that the agreement was not terminated because Roll-Kraft had the right to reduce Grimes compensation under the contract.

49.     The compensation provision in Grimes' Employment Agreement states as follows: "As compensation for Employee's Services during the term of this Agreement, the Company agrees to pay Employee per offer letter and reviews ...." (PX 1, ¶ 3). The offer letter referred to set Grimes' initial base salary at $50,000. (PX 2). It was Roll-Kraft's practice to review and critique the performance of its salesmen on an ongoing basis.

50.     Roll-Kraft insisted that salesmen enter detailed customer contact notes into the ACT (and then BAM) databases on a timely basis. Grimes did not follow Roll-Kraft's established procedures.

51.     Roll-Kraft warned Grimes about his failure to add his customer contact notes to the ACT system on a thorough and timely basis starting in the fall of 1999. (PX 3). Roll-Kraft told Grimes that he would have to enter his customer contact notes into the ACT system, otherwise Roll-Kraft would deduct $2,500 from his pay. In response, Grimes promised that he would put his contact notes in the ACT system no later than Monday morning of each week. (*Id.*). Roll-Kraft explained that if Grimes did not follow through on his promise to do so, Roll-Kraft would be forced to deduct $5,000 from his pay, instead of the $2,500 originally discussed. (*Id.*). Grimes promised that he would diligently input his contact notes and that it would not be necessary for Roll-Kraft to discipline him. (*Id.*). Grimes did not follow through on his promise. On September 19, 2000 Gehrisch gave Grimes a final warning via email in which he stated that Grimes had to enter his customer visit notes in a timely fashion and that Grimes knew the consequences if he failed to perform. (PX 3). Grimes replied to Gehrisch by email as follows: "Yes sir, you are right, I will do better" (*Id.*) Grimes failed to perform as promised. On October 3, 2000, Roll-Kraft imposed the threatened $2,500 deduction for substandard performance. (PX 4).

52.     The second affirmative defense alleges that the Employment Agreement between Grimes and Roll-Kraft was terminated before October 2001 by Roll-Kraft when Roll-Kraft refused to pay Grimes, when due, commissions on sales at the rate of 1.5% of the

22

gross selling price and refused to provide an accounting to Grimes of commissions to which he was entitled.

53.    As a result of an accounting error, Grimes initially was paid commissions at the rate of 1% rather than 1.5%. This resulted from the Payroll Department apparently not being aware of the commission rate negotiated by Grimes, which differed from the commission of other salesmen. Grimes called this deficiency to the attention of Roll-Kraft, which rectified the error.

54.    Commissions were payable "once the job had shipped and payment is received". (PX 2). Roll-Kraft paid commission once final payment was received from the customer. Grimes was paid all commissions due on sales for which final payment was received. Grimes has failed to produce any evidence that he was not paid properly. Even if a dispute existed, Grimes never sought to terminate the contract by giving thirty (30) days prior notice. (PX 1, ¶ 4).

55.    The third affirmative defense alleges that the Employment Agreement is unenforceable under Illinois law because of the restrictions on employment it seeks to impose upon Grimes. For the reasons discussed elsewhere in this decision, the Court finds the non-disclosure and non-compete provisions to be enforceable.

56.    The fourth affirmative defense alleges that Roll-Kraft "has unclean hands". The affirmative defense does not indicate why Roll-Kraft has unclean hands. To the extent this affirmative defense is based upon the argument that Roll-Kraft instituted this action to harass Chicago Roll and Grimes it is rejected. This action was brought by Roll-Kraft in good

faith to protect its valuable business assets.

57.     Plaintiff has met its burden to establish sufficient facts to entitle it to judgment under all five counts of the complaint.

58.     The Defendants have failed to meet their burden to establish sufficient facts to support their four affirmative defenses

## S.     DEFENDANTS ACTED WILLFULLY AND MALICIOUSLY

59.     The Defendants have acted in a willful and malicious manner to misappropriate and use Roll-Kraft's trade secrets.  They acted to intentionally misappropriate Roll-Kraft's trade secrets for their own financial gain in conscious disregard of Roll-Kraft's rights to protect and preserve its trade secret information.

## II. CONCLUSIONS OF LAW

### A.  JURISDICTION

60.  This Court has jurisdiction over this diversity action under 28 U.S.C. § 1332.

### B.  ILLINOIS LAW APPLIES

61.  The parties stipulate that Illinois law applies.

### C.  DEFENDANTS VIOLATED THE ILLINOIS TRADE SECRETS ACT

62.  To establish a violation of the Illinois Trade Secrets Act ("ITSA") Roll-Kraft

must prove two elements: 1) the existence of a "trade secret"; and 2) "misappropriation" of

that trade secret.  ITSA §§ 2 and 3; *PepsiCo, Inc. v. Redmond*, 54 F.3d. 1262, 1268 (7th Cir.

1995) (applying ITSA).  The ITSA defines a "trade secret" as:

> Information, including but not limited to, technical or non-
> technical data, a formula, pattern, compilation, program, device,
> method, technique, drawing, process, financial data, or list of
> actual or potential customers or suppliers that: (1) is sufficiently
> secret to derive economic value, actual or potential, from not
> being generally known to other persons who can obtain
> economic value from its disclosure or use; and (2) is the subject
> of efforts that are reasonable under the circumstances to
> maintain its secrecy or confidentiality.

ITSA § 2(d).

63.  The protection accorded to trade secrets reflects balancing conflicting social and

economic concerns.  *Service Centers of Chicago, Inc. v. Minogue*, 535 N.E.2d. 1132, 1135

(1st Dist. 1989).  An employer who invested time, money, and effort in developing a secret

advantage should be protected from a former employee who obtains the secret improperly.

25

*Id.* However, the court must also recognize in a society based on competition, the employee has a right to make use of the general knowledge and skills acquired through experience in pursuing his suited occupation. *Id.*

64.     The focus of the ITSA in determining whether information is a trade secret is "on the secrecy of the information sought to be protected." *Stampede Tool Warehouse, Inc. v. May,* 651 N.E.2d. 209, 215 (1st Dist. 1995). The key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense." *Id.* Where the information is not "readily ascertainable" from a public source but, rather, is developed over time with a substantial amount of effort and expense, the information is "secret." *Id.* at 216. Information meeting the ITSA "secrecy" criterion includes customer lists that are not readily ascertainable (*Id.*) (obtaining a list of end users through telephone books, catalogues, and other public sources, contacting those people to get names of potential customers and salesmen developing a relationship with those potential customers is a protectable trade secret); pricing, distribution and marketing plans (*PepsiCo, Inc. v. Redmond*, 54 F.3d. at 1269-70); and sales data and market analysis information (*Barrier, Inc. v. Stanley Works,* 79 F.3d. 1112, 1117 (Fed. Cir. 1996) (applying ITSA).

65.     Roll-Kraft's ACT, BAM and NPI data meet the "secrecy" criteria under the ITSA. Such information includes: 1) names and addresses of all customers and potential customers and contact persons; 2) historical sales information; 3) details of pending sales

quotations; 4) year-to-date sales figures; and 5) shipping, pricing, cost and profit margin information. Such information is not readily ascertainable from any source of public information. Indeed, the only source of this information is Roll-Kraft's internal computer system. Furthermore, developing relationships with its customers and documenting all customer contacts is emphasized to Roll-Kraft's sales force and is a key part of their business.

66. The information contained in Roll-Kraft's ACT, BAM and NPI systems is more extensive than the customer lists found to be trade secrets in *Stampede Tool*; *Gillis Associated Industries, Inc. v. Cari-All, Inc.,* 564 N.E.2d. 881, 885 (1st Dist. 1990) (finding customer list "sufficiently secret" where list was not easily duplicated by reference to trade journals or yellow pages because no one source is sufficient and further refinement of list, such as target mailings or telephone calls, is required); and *Elmer Miller, Inc. v. Landis,* 624 N.E.2d. 338, 342 (1st Dist. 1993) (concluding competitors cannot duplicate customer list without a "significant expenditure of time, effort and expense"). The information contained in ACT, BAM and NPI meets the ITSA section 2(d)(1) test for information sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

67. Roll-Kraft must also establish that it took reasonable steps to safeguard its confidential information. ITSA § 2(d)(2). Disclosure to only those who need the contents of a trade secret is adequate protection under the ITSA. *Service Centers of Chicago, Inc. v.*

*Minogue,* 535 N.E.2d. at 1136 (finding trade secret protection is maintained when the information is used by a person in his business operations and is known only by such person and such limited other persons to whom it may be reasonably necessary to confide it); *Elmer Miller, Inc. v. Landis,* 624 N.E.2d. at 343 (finding only the employees who needed to know the information had access to it). Furthermore, the *Stampede* court held a customer list to be a trade secret because Stampede used "reasonable efforts" to maintain its secrecy and confidentiality. 651 N.E.2d at 216. In *Stampede,* the offices were locked, garbage was checked daily, special computer access codes were used, customer information was limited to persons on a need-to-know basis, hard copies of customer lists were kept locked in the office, salesmen's call books and customer cards were locked up and could not be removed from the office, and security cameras were used. *Id.* Moreover, employees signed employee confidentiality agreements. *Id.*

68.     Similarly, in this case access to the ACT, BAM and NPI information is afforded to Roll-Kraft employees only on a "need-to-know" basis. Roll-Kraft maintains the secrecy of this information through such means as limited access and password-protected computer databases. The information contained in ACT, BAM and NPI therefore constitutes trade secrets within the meaning of the ITSA. Furthermore, Roll-Kraft employees sign employment agreements or sign for the receipt of employee handbooks containing non-disclosure clauses.

69.     The ITSA provides that "actual or threatened misappropriation" of a trade

secret may be enjoined. ITSA § 3(a). "Misappropriation" means, in pertinent part:

> (1)    acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2)    disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
>> (A)    used improper means to acquire knowledge of the trade secret; or
>>
>> (B)    at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>>
>>> (I)    derived from or through a person who utilized improper means to acquire it;
>>>
>>> (II)    acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (III)    derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

ITSA § 2(b). "Improper means" of acquiring a trade secret includes "theft, ... breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." ITSA § 2(a). ITSA Section 2(b) provides that acquisition by improper means constitutes misappropriation. *Stampede Tool v. May*, 651 N.E.2d. at 217 ("a trade secret can be misappropriated by physical copying or by memorization").

70.    Grimes used "improper means" in misappropriating Roll-Kraft's trade secrets. While employed by Roll-Kraft, Grimes downloaded, copied or otherwise transmitted the ACT, BAM and NPI data for purposes other than serving the interests of Roll-Kraft. The

Court reaches this conclusion based on direct and strong circumstantial evidence. In addition, Defendants never placed any witness on the stand to explain: 1) why Grimes accessed Roll-Kraft's computers on October 16, 2001 after business hours from his home computer, or 2) why 60 megabytes of information was deleted from Grimes' home computer between November 15 and December 8, 2001, or 3) why he defragmented his home computer four times in ten days in November, 2001, when no mechanical or engineering reason required it.

71.     Chicago Roll also "misappropriated" Roll-Kraft's trade secrets in that shortly after Grimes started working for Chicago Roll, Grimes disclosed Roll-Kraft's trade secret information to other Chicago Roll personnel. *Mangren Research & Development v. National Chemical Co.,* 87 F.3d. 937, 944-45 (7th Cir. 1996) (holding once former employee of plaintiff apprised his new employer of plaintiff's trade secrets and his new employer made use of such trade secrets, his new employer was liable for misappropriation under the ITSA). In addition, since joining Chicago Roll Grimes solicited business from customers of Roll-Kraft whom he previously called on while working for Roll-Kraft, all the while using Roll-Kraft's trade secret information.

72.     Alternatively, Grimes and Roll-Kraft unlawfully misappropriated Roll-Kraft's trade secret information because it is inevitable Grimes will use the information he obtained through improper means in his job with Roll-Kraft. This inevitable use of Roll-Kraft's trade secret information will allow Chicago Roll to gain a substantial unfair competitive advantage

over Roll-Kraft. *PepsiCo v. Redmond*, 1996 W.L. 3695 at *17-20 (N.D. Ill. 1996). The factors to determine whether disclosure of trade secrets is inevitable are: 1) the level of competition between the former employer and the new employer; 2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and 3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *Id.* at *20. In this case, there is no dispute Roll-Kraft and Chicago Roll are direct competitors. The Court also concludes Roll-Kraft has shown Grimes' new position is sufficiently comparable to his former position at Roll-Kraft to make disclosure of Roll-Kraft's trade secrets inevitable in his new position. Grimes territory as a salesmen with Chicago Roll is substantially similar to his territory when he was at Roll-Kraft. As to the last element, "it is only fair to shift the burden to defendants, to prove" that Grimes will not use or disclose Roll-Kraft's confidential information. *Id.* at *21. Defendants control the evidence as to what duties Grimes will be assigned; however, Defendants have failed to prove Grimes' former position is not comparable to his new position and that it will not involve the use of Roll-Kraft's confidential information. *Id.* at *22.

73.     The facts in this case are similar to those in *PepsiCo*. There, a high level employee of PepsiCo with access to sensitive trade secret information went to work for a competitor, Quaker Oats. PepsiCo and Quaker competed in the sports and new age drink markets. Here, Grimes had access to Roll-Kraft's sensitive, confidential information as

31

contained within its ACT, BAM and NPI computer systems. Here, also, Roll-Kraft and Chicago Roll seriously compete in the tube, pipe and roll form industry. In this case, as in *PepsiCo*, Chicago-Roll, like Quaker, recently hired away other Roll-Kraft personnel before hiring away Grimes. Here, as in *PepsiCo*, it is Grimes' intention to work for a competitor and here, like there, it is apparent that he intends to use Roll-Kraft's trade secret information and will inevitably disclose it to Chicago-Roll personnel.

74.    The facts in this case compel the issuance of an injunction alternatively under the doctrine of inevitable disclosure because in *PepsiCo*, there was no physical taking of trade secret materials. Rather, the employee just had the information in his head as a result of doing his job. Here, on the other hand, Grimes copied Roll-Kraft's ACT, BAM and NPI data so that he could use it while working for Chicago-Roll. Therefore, Roll-Kraft has rights under the ITSA that are entitled to protection, and Grimes and Chicago Roll have violated or inevitably will violate those rights.

75.    Because direct evidence of theft and use of trade secrets is often not available, the plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence. *PepsiCo, Inc. v. Redmond*, 1996 W.L. 3695*15 (N.D. Ill. 1996). In *PepsiCo*, the Court stated:

> It is frequently true in trade secret cases that "[m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs [like *PepsiCo*] must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact

> take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything."

*Id.*, quoting *Si Handling Systems, Inc. v. Heisley*, 753 F.2d. 1244, 1261 (3rd Cir. 1985). In addition, the ITSA permits an injunction to issue to prevent even threatened use or disclosure of trade secrets. ITSA § 3. Moreover, the defendants' spoliation of evidence on their computer supports a negative inference that defendants destroyed evidence of misappropriation. *Minnesota Mining & Mfg. Corporation. v. Pribyl*, 259 F.3d. 587, 606 n. 5 (7th Cir. 2001) (spoilation of computer data). Therefore, the Court could find misappropriation even without the direct evidence supplied by Tracy and Saperstein. The Court concludes that with or without such direct evidence, Roll-Kraft has proven by a preponderance of the evidence that Grimes and Roll-Kraft misappropriated its trade secrets.

## D. GRIMES CONVERTED ROLL-KRAFT'S PROPERTY

76. The elements of conversion under Illinois law are: 1) plaintiff has a right to the property; 2) plaintiff has an absolute and unconditional right to the immediate possession of the property; 3) plaintiff made a demand for possession; and 4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Johnson v. Grossinger Motorcorp, Inc.*, 753 N.E. 2d. 431 (1st Dist. 2001).

77. In this action, Roll-Kraft is the lawful owner of the ACT, BAM and NPI information and is entitled to possession of such information. The day after Grimes' resignation from Roll-Kraft, Roll-Kraft via its attorneys sent Grimes a letter demanding he

return any and all Roll-Kraft information in his possession. Grimes' continued possession of the data constitutes exercise of control over property inconsistent with Roll-Kraft's right to possession thereof, and therefore constitutes conversion by Grimes.

## E.    GRIMES BREACHED HIS DUTY OF LOYALTY TO ROLL-KRAFT

78.    During the course of employment, an employee owes an undivided duty of fidelity and loyalty to his employer. *Dames & Moore v. Baxter & Woodman, Inc.,* 21 F. Supp. 2d. 817 (N.D. Ill. 1998). This duty of loyalty includes acting solely in the interest of the employer. *ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.,* 62 Ill. App. 3d. 671, 379 N.E. 2d. 1228, 1237 (1st Dist. 1978).

79.    By downloading or copying the ACT, BAM and NPI data during the course of his employment in order to use it to compete with Roll-Kraft thereafter, Grimes breached his duty of loyalty and fidelity to Roll-Kraft. *Hill v. Names & Addresses, Inc.,* 571 N.E.2d 1085, 1091 (1st Dist. 1991).

## F.    BREACH OF NONDISCLOSURE AND NON-SOLICITATION COVENANTS

80.    The basic test applied by Illinois courts in determining the enforceability of restrictive covenants is "whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer." *Office Mates 5, North Shore, Inc. v. Hazen,* 599 N.E.2d 1072, 1080 (1st Dist. 1992).

81.    Illinois courts have long recognized two situations in which an employer has a legitimate business interest to justify enforcement of a covenant not to compete: 1) where

the former employee acquired trade secret or other confidential information through his employment and subsequently tried to use it for his own benefit; and 2) where the customer relationships are near-permanent and but for the employee's association with the employer the employee would not have had contact with the customers. *Outsource International, Inc. v. Barton*, 192 F.3d. 662, 666 (7th Cir. 1999). Roll-Kraft has met both tests as alternative grounds for enforcing its non-compete covenant.

82. Grimes' Employment Agreement with Roll-Kraft contains a valid nondisclosure and non-compete covenant. As referred to above in connection with the ITSA claim, Grimes used or tried to use the confidential information for his own benefit. Therefore, he breached the covenant of nondisclosure. *PepsiCo, Inc., supra,* 55 F.3d. at 1271-72 (injunction warranted for breach of nondisclosure agreement signed by former employee).

83. A restrictive covenant may be enforced if the employee learned trade secrets or other confidential information while in the plaintiff's employ and subsequently attempted to use it for his own benefit. *Springfield Rare Coin Galleries, Inc. v. Mileham*, 620 N.E.2d 479, 485 (4th Dist. 1993). That is the case here. Grimes breached his covenant not to compete.

84. A covenant not to solicit customers is also enforceable if the employer has a near-permanent relationship with its customers or clients. *Outsource International, Inc. v. Barton*, 192 F.3d. at 667. Roll-Kraft has a near-permanent relationship with many of its

customers. Roll-Kraft is a job shop that provides design, manufacturing, service and training in connection with its products and services. Roll-Kraft has invested substantial time and effort in qualifying, developing and maintaining customers; training and providing salespeople, engineers, technical support people, service personnel, trainers and other personnel and facilities; its products are distinguished by higher quality and price; it has long-standing relationships with many of its customers, including major customers; and it supplies a substantial portion of the requirements of its customers for high quality products and after market services. Roll-Kraft supplies a differentiated product and service that are not fungible and enjoys a near-permanent relationship with its customers. *Outsource International, Inc. v. Barton,* 192 F.2d. at 667-68. Further, Grimes had no background in the tube pipe and roll form industry before he went to work for Roll-Kraft, which provided him with extensive training, introductions to customers, lists of qualified and existing customers, and extensive sales, marketing, engineering, technical and service support. Grimes did not bring any customers with him when he joined Roll-Kraft. But for Grimes' association with Roll-Kraft, he would not have had contact with the customers in question.

85.     The geographic and time limitations imposed by the restrictive covenant is reasonable because Grimes was given access to all of Roll-Kraft's confidential customer information and the limitation does not prevent Grimes from competing in a large part of the United States. The three year restriction is reasonable because of the extensive efforts Roll-Kraft has made to develop its customer database and the fact that Grimes had no experience

in this industry when he joined Roll-Kraft. Gene A. Peterson, *Understanding Illinois Noncompetition Agreements and Restrictive Covenants*, Illinois Bar Journal, Sept. 2001, at 476.

## G. CHICAGO ROLL TORTIOUSLY INTERFERED WITH THE ROLL-KRAFT / GRIMES EMPLOYMENT AGREEMENT

86.     The elements of tortious interference with contract are: (1) the existence of a contract to which the plaintiff is a party; (2) knowledge by the defendant of the existence of the contract; (3) intentional interference with that contract; and (4) damages proximately caused by the interference. *George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F. 2d. 1326, 1330 (7th Cir. 1983).

87.     Chicago Roll knew of the existence of Grimes' Employment Agreement with Roll-Kraft before Chicago Roll hired Grimes. Chicago Roll's offer of employment to Grimes intentionally interfered with that Agreement and caused damage to Roll-Kraft. The fact that Grimes initially approached Chicago Roll about going to work there is of no moment because if Chicago Roll had not shown interest and offered Grimes a job, he would not have left Roll-Kraft at that time. Despite knowing that if Grimes was competing with Roll-Kraft and taking and disclosing Roll-Kraft's confidential information would violate his Employment Agreement, Chicago Roll hired Grimes in a sales position. Chicago Roll agreed to compensate him for directly competing against Roll-Kraft, including calling upon the very same customers that he had just called upon for Roll-Kraft. In addition, Chicago Roll encouraged and accepted the receipt and disclosure and use of Roll-Kraft's confidential

information. By these actions, Chicago Roll tortiously interfered with Roll-Kraft's contract with Grimes. Chicago Roll's conduct was willful, intentional and malicious.

## H. AFFIRMATIVE DEFENSES

88. The affirmative defenses are denied and judgment thereon will be entered for Roll-Kraft. First, Roll-Kraft has a right under the Employment Agreement to modify Grimes' compensation upon review. That is what happened in this case. Second, Grimes has failed to prove that he was owed any additional commissions and even if he were owed commissions, that did not terminate his Employment Agreement. Third, the Employment Agreement between Grimes and Roll-Kraft is enforceable under Illinois law. Finally, Defendants have failed to prove that Roll-Kraft was guilty of unclean hands.

## I. DAMAGES UNDER ITSA

89. In addition to enjoining actual or threatened misappropriation (ITSA § 3), a prevailing plaintiff is entitled to recover damages for misappropriation under the ITSA. *Id.,* §4. The ITSA provides that damages can include both "the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." *Id.* § 4(a). The Act further provides that "[i]f neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the Court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." *Id.* In addition, the Act provides for exemplary damages in an

amount not exceeding twice any award made under Section 4(a) if "willful and malicious misappropriation" exists. *Id.* § 4(b). The phrase "willful and malicious misappropriation" includes both an intentional misappropriation and a misappropriation resulting from the conscious disregard of the rights of another. *Mangren Research & Development Corp. v. National Chemical Co.*, 87 F.3d. at 946.

90. Chicago Roll was aware of Grimes' previous employment at Roll-Kraft and of his access there to Roll-Kraft's confidential customer information. Chicago Roll was also aware of Grimes' Employment Agreement containing nondisclosure of confidential information provisions. Chicago Roll viewed the confidential information that Grimes took from Roll-Kraft. This is a clear case of willful and malicious misappropriation. In addition, Chicago Roll had Grimes sign an indemnity agreement on his first day of work providing that he would indemnify and defend Chicago Roll if it were sued by Roll-Kraft for employing Grimes. This calculated risk constituted a conscious disregard of the rights of Roll-Kraft. Grimes' and Chicago Roll's conduct amply justifies exemplary damages under the ITSA and on the common law conversion breach of duty of loyalty and tortious interference with contract claims. Under these circumstances, the Court finds that $100,000 represents a reasonable royalty from the unauthorized use and disclosure by Defendants of Roll-Kraft's trade secrets which have a value in the millions of dollars. In addition, the Court awards exemplary damages of $150,000 to Roll-Kraft and against Defendants for their willful and malicious misappropriation of trade secrets and their attempted cover-up. Such an award is

necessary to discourage Defendants from engaging in such serious misconduct and from engaging in a deliberate attempt to cover up their wrongdoing. Such an award is also consistent with the Supreme Court standards in awarding punitive damages: 1) the defendant's conduct was reprehensible; 2) there is little disparity between the actual damages and the punitive damages awarded; and 3) the award is comparable to other similar cases. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 121 S.Ct. 1678, 1687, 532 U.S. 424 (2001).

## J.   ATTORNEY'S FEES

91.   The ITSA provides in pertinent part that if "willful and malicious misappropriation" exists, the Court "may award reasonable attorneys fees to the prevailing party." ITSA § 5.

92.   The conclusion that willful and malicious misappropriation exists for purposes of awarding exemplary damages as discussed above, also resolves Roll-Kraft's entitlement to an award of fees under the ITSA, as Section 5 of the Act authorizes an award of fees if "willful and malicious misappropriation exists." *Mangren Research, supra,* 87 F.3d. at 946 n. 5.

## III.   <u>CONCLUSION</u>

When you play with fire, you may get burned. This is such a case. For the reasons set forth in this opinion, the Court directs the Clerk of the Court to enter judgment in favor of Plaintiff RKI, Inc., d/b/a Roll-Kraft and against Defendants Steven Grimes and Chicago Roll

Co., Inc. as follows:

### COUNT I – ILLINOIS TRADE SECRET ACT

A permanent injunction against both defendants, compensatory damages in the amount of $100,000, plus punitive damages in the amount of $150,000, plus attorneys fees and Court costs against both defendants, jointly and severally, as more fully set forth in the judgment order.

### COUNT II – CONVERSION

Compensatory damages in the amount of $100,000, plus punitive damages in the amount of $150,000 against defendant Steven Grimes, individually.

### COUNT III – BREACH OF DUTY OF LOYALTY

Compensatory damages in the amount of $100,000, plus punitive damages in the amount of $150,000 against defendant Steven Grimes, individually.

### COUNT IV – BREACH OF NON-DISCLOSURE AND NON-SOLICITATION COVENANTS

A permanent injunction against defendant Steven Grimes, plus compensatory damages in the amount of $100,000, plus punitive damages in the amount of $150,000 against defendant Steven Grimes, individually as more fully set forth in the judgment order.

### COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT

Compensatory damages in the amount of $100,000, plus punitive damages in the amount of $150,000 against defendant Chicago Roll Company, Inc.

The Court intends for Roll-Kraft to recover no more than a total of $100,000 in compensatory damages and $150,000 in punitive damages. The damage awards are not intended to be cumulative, but rather provide alternative grounds for the award.

**SO ORDERED THIS 21st DAY OF DECEMBER, 2001.**


_____
**MORTON DENLOW**
**United States Magistrate Judge**


**Copies Delivered in Open Court to:**

Michael J. Ranallo
Mark L. Shapiro
Sean Nash
Holland & Knight LLP
55 West Monroe, Suite 800
Chicago, Illinois 60603
(312) 263-3600

Thomas F. Howard
201 S. Bloomingdale Road
Bloomingdale, IL 60108
(630) 671-5615


Attorney for Plaintiff

Attorney for Defendants

**DOCK━━━━**

**DEC 2 6 2001**

| | |
|---|---|
| RKI, INC., d/b/a ROLL-KRAFT, ) | |
| ) | |
| Plaintiff, ) | Case No. 01 C 8542 |
| ) | |
| v. ) | |
| ) | |
| STEVEN GRIMES and CHICAGO ) | |
| ROLL CO., INC., ) | Magistrate Judge Morton Denlow |
| ) | |
| Defendants. ) | |

## FINAL JUDGMENT ORDER

This action came to trial before the Court. The parties have consented to the jurisdiction of Magistrate Judge Morton Denlow under 28 U.S.C. §636(c). The issues have been tried and the Court has entered a Memorandum Opinion and Order dated December 21, 2001.

**IT IS HEREBY ORDERED,** that judgment with respect to all claims raised in Plaintiff's five-count complaint be entered as follows:

(1)     Judgment is entered in favor of Plaintiff, RKI, Inc., d/b/a Roll-Kraft and against Defendants Steven Grimes and Chicago Roll Co., Inc. on Count I;

(2)     Judgment is entered in favor of Plaintiff, RKI, Inc., d/b/a Roll-Kraft and against Defendant Steven Grimes on Counts II, III and IV;

(3)     Judgment is entered in favor of Plaintiff, RKI, Inc., d/b/a Roll-Kraft and against Defendant Chicago Roll Co., Inc. on Count V;

27

(4)     Judgment is entered in favor of Plaintiff, RKI, Inc., d/b/a Roll-Kraft and against Defendants Steven Grimes and Chicago Roll Co., Inc. on all of Defendants' affirmative defenses;

(5)     Defendant Steven Grimes ("Grimes"), his agents, servants, employees and attorneys, and all persons in active concert or participation with them, are hereby permanently enjoined:

        (a)     from using or disclosing plaintiff RKI, Inc. d/b/a Roll-Kraft's ("Roll-Kraft") ACT and BAM customer contact management software and information and NPI enterprise resource planning information, including but not limited to, information for each customer or prospective customer relating to Roll-Kraft's pending bids; Roll-Kraft's customer contacts; Roll-Kraft's current and historical sales figures; Roll-Kraft's orders, shipment dates and inquiry dates; and Roll-Kraft's prices, costs and profit margins;

        (b)     to return to Roll-Kraft within seven (7) days of the issuance of this Judgment Order, all ACT and BAM software and information and NPI information, including all copies or excerpts thereof, in any form or medium, in his possession, custody or control and to certify in writing to the Court and to plaintiff within seven (7) days of the issuance of this order that he has complied with this Subparagraph (5)(b); and

2

(c)     from assuming or performing, through November 8, 2002, any sales or marketing activities, directly or indirectly, as an employee of Chicago Roll or of any employer, or as a sales representative, agent, finder, consultant, partner, joint venturer, proprietor, shareholder, or in any other capacity involving any customer or prospect of Roll-Kraft to which Grimes was assigned at any time during his employment at Roll-Kraft.

(6)     That Steven Grimes is also hereby enjoined for a period through October 18, 2004, within Lake, Ashtabula, Geauga and Cuyahoga counties in Ohio, or within a radius of fifty (50) miles from Chicago, Illinois, and Birmingham, Alabama, from soliciting, accepting business, patronage or orders directly or indirectly from existing or potential customers of RKI, Inc. whether on his own account or as a partner, joint venturer, employee, agent, representative, consultant, shareholder, or in any other capacity.

(7)     That defendant Chicago Roll Co., Inc. ("Chicago Roll"), its officers, agents, servants, employees and attorneys and all persons in active concert or participation with them, are hereby permanently enjoined:

(a)     from seeking, acquiring, using or disclosing Roll-Kraft's confidential ACT and BAM customer contact management software and information and NPI enterprise resource planning information, including but not limited to, information for each customer or prospective customer relating to Roll-Kraft's pending bids; Roll-Kraft's customer contacts; Roll-Kraft's

current and historical sales figures; Roll-Kraft's orders, shipment dates and inquiry dates; and Roll-Kraft's prices, costs and profit margins;

(b)     to return to Roll-Kraft within seven (7) days of the issuance of this Judgment Order, all ACT and BAM software and information and NPI information, including all copies or excerpts thereof, in any form or medium, in its possession, custody or control, and to certify in writing to the Court and to plaintiff within seven (7) days of the issuance of this order that Chicago Roll has complied with this Subparagraph (7)(b); and

(c)     from permitting Grimes to assume or perform marketing or sales duties for Chicago Roll, directly or indirectly, in any manner or capacity through November 8, 2002 which involves any customer or prospect of Roll-Kraft to which Grimes was assigned at any time during his employment at Roll-Kraft.

(8)    Judgment is hereby entered in favor of Plaintiff RKI, Inc. and against Defendants Steven Grimes and Chicago Roll Co., Inc., jointly and severally, in the sum of One Hundred Thousand Dollars ($100,000.00) in compensatory damages and One Hundred Fifty Thousand Dollars ($150,000.00) in exemplary damages.

(9)    Judgment is hereby entered in favor of Plaintiff RKI, Inc. and against Defendants Steven Grimes and Chicago Roll Co., Inc., jointly and

4

severally, for Plaintiff's reasonable attorneys' fees and court costs.
Plaintiff shall file its petition for fees and court costs by January 31,
2002. Defendants shall file its objections, if any, by February 22, 2002

(10) The Agreed Temporary Restraining Order entered on November 19,
2001 is hereby dissolved. The clerk of Court is hereby directed to
return the $15,000 cash bond to plaintiff RKI, Inc.

(11) This Court will retain jurisdiction to enforce the terms of this Judgment
Order.

**SO ORDERED THIS 21ˢᵗ DAY OF DECEMBER, 2001.**

_Morton Denlow_

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies Delivered in Open Court to:**

Michael J. Ranallo
Mark L. Shapiro
Sean Nash
Holland & Knight LLP
55 West Monroe, Suite 800
Chicago, Illinois 60603
(312) 263-3600

Thomas F. Howard
201 S. Bloomingdale Road
Bloomingdale, IL 60108
(630) 671-5615

Attorneys for Plaintiff

Attorney for Defendants